## IN THE UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF ARKANSAS
## NORTHERN DIVISION

IN RE:  ANTHONY G. ARNOLD,                              Case No. 3:17-bk-15107
                                                                    (Chapter 7)
           Debtor.

UNITED STATES TRUSTEE                                          PLAINTIFF

VS.                              AP Case No. 3:18-ap-01046

ANTHONY G. ARNOLD                                             DEFENDANT


### MEMORANDUM OPINION

Daniel J. Casamatta, the Acting United States Trustee (the "**UST**") seeks to have the

discharge of Anthony G. Arnold (the "**Debtor**") denied pursuant to 11 U.S.C. § 727(a)(2), (a)(3),

(a)(4), and (a)(7).  A trial on the merits of the UST's complaint was held in Little Rock,

Arkansas, by consent of the parties on July 21, 2022.  Joseph A. DiPietro, Trial Attorney,

represented the UST.  Katherine Black, a bankruptcy auditor for the UST's office, appeared and

testified on behalf of the UST, along with Hamilton Mitchell, the Chapter 7 Trustee in the

Debtor's current bankruptcy case (the "**Chapter 7 Trustee**").  Stanley V. Bond of the Bond Law

Office represented the Debtor who also appeared and testified on his own behalf.

The UST primarily argues the Debtor transferred his home without court authority while

in a previous bankruptcy case, concealed the transfer of the home, and made false oaths in

connection with this case and his previous bankruptcy case.  The Debtor argues he disclosed the

transfer of the home in his Statement of Financial Affairs (the "**SOFA**") in the current case, and

any false statements made were unintentional, immaterial, and had no effect on the administration of the current bankruptcy case.

For the reasons stated below, the Court finds in favor of the Debtor.

## I. Jurisdiction

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(J).  The following constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.  The parties have consented to this Court entering a final judgment on all claims and causes of action asserted in this adversary proceeding.

## II. Facts

### A. General Background

The Debtor has been a farmer since 1980.  He attended college for two years at Arkansas State University.  The Debtor testified that he kept detailed personal financial records by maintaining all crop receipts and receipts for expenses such as seed, fertilizer, labor, and machinery repairs.  He took these receipts and any documentation he received regarding his personal financial records to his accountant, Jimmy Wilson, on a quarterly basis.  Mr. Wilson took care of the Debtor's books and prepared his tax returns.

This is the Debtor's second bankruptcy case.  The first case was filed as an individual Chapter 11 case on October 6, 2014, and was dismissed on August 31, 2017 (the "**Chapter 11 Case**").[1]  The Debtor listed his residence in both the Chapter 11 Case and the current case as 3573 CR 118, Bono, Arkansas (the "**Residence**").  The Residence is located in Craighead County, Arkansas.  The Residence was listed as an asset in the Debtor's Chapter 11 Case, but is

---

[1] Case No. 3:14-bk-15365, Eastern District of Arkansas, Northern Division.

not listed as an asset in the current case.  As will be discussed in more detail below, the Debtor transferred his interest in the Residence to Arnold Family Farms ("**AFF**") in January 2016 while the Chapter 11 Case was pending.

The evidence introduced at trial as to both the Chapter 11 Case and the current case is summarized below.

### B. Chapter 11 Case

A substantial amount of the evidence presented by the UST focused on the Debtor's Chapter 11 Case.  The Debtor was represented by Jeannette A. Robertson of the Robertson Law Firm in the Chapter 11 Case until April 2017 when Theresa L. Pockrus of the Nixon Law Firm substituted as counsel for the Debtor.[2]  Shortly after he filed his Chapter 11 Case, the UST's office conducted an initial debtor interview.  At this interview, the Debtor was informed of his obligations and fiduciary duties as a debtor-in-possession.  Specifically, the Debtor was informed of his obligations to file monthly operating reports and to obtain court approval of the use, sale, or lease of property, other than in the ordinary course of business.

### (1) Operating Reports

While the Chapter 11 Case was pending, the Debtor filed thirty-two of the thirty-three operating reports that were to be filed in the case.  After hearing the testimony of Ms. Black that a report was missing, the Debtor stated he was certain he completed all the operating reports, provided all the reports to his attorney, and stated he had them in the courtroom.  Even missing one report, Ms. Black admitted it is "unusual to have that complete a set of operating reports filed in [an] individual's Chapter 11 case so timely."  (Tr. at 38).

---

[2] The testimony revealed that Ms. Robertson became unresponsive to the Debtor.  In April 2017, she withdrew as counsel for the Debtor due to illness.

The operating report form used at the time the Debtor's Chapter 11 Case was pending has the case name, case number, and month being reported at the top of the form. Below that information, the form starts with "Beginning Checkbook Balance," then has "Cash Receipts," "Cash Disbursements," and "Ending Checkbook Balance." (UST Ex. 11).

The Debtor discussed how difficult the operating reports were to complete attributing part of the problem to the fact that the dates covered by his bank statements and the operating reports did not coincide. He testified he was given a packet and told to take it home, read it, and start filling out the reports. He had no help filling out the reports and testified that he did not understand what needed to be reported in the operating reports. He would fill out the reports and then take the reports to Ms. Robertson for her to file with the Court and provide to the UST's office. When he asked Ms. Robertson questions about how to report something, she was not responsive. He recalled her making statements such as, "Well, the Trustee hasn't said anything, so apparently you're doing something right." (Tr. at 110). When Ms. Pockrus was employed to represent the Debtor in the Chapter 11 Case, she told him the reports were filled out incorrectly and explained how the reports were to be done. It was the Debtor's understanding that Ms. Pockrus intended to amend the previous operating reports, but no amended reports were filed.

As discussed in more detail below, the Debtor transferred his interest in the Residence in January 2016, but neither the December 2015 operating report nor January 2016 operating report reflected the sale of the Residence or the receipt of any proceeds from the sale. Ms. Black testified that the Debtor's 2015 and 2016 tax returns likewise did not reflect a capital gain or loss related to the sale of the Debtor's Residence or indicate that the Residence was sold.[3]

---

[3] The UST introduced portions of the 2015 tax return into evidence. The return does reflect a long-term capital gain of $244,798.00 associated with the Debtor's Schedule K-1 from Arnold Land Company LLC. The portion of Schedule K-1 introduced into evidence does not reflect the source of the capital gain.

4

The UST introduced numerous checks dated from December 2014 through June 2017, while the Chapter 11 Case was pending, that were made payable to the Debtor from AFF. AFF was owned by the Debtor's parents, Bobby and Joan Arnold. The UST received copies of the checks during discovery. Ms. Black created a spreadsheet to compare the total amount of the checks written to the Debtor by AFF that cleared during the month of each operating report with the amount of receipts shown on the Debtor's monthly operating report for the same month. By her calculations, the checks totaled approximately $34,000.00 more than the stated receipts.

When asked about the additional income not reported on his monthly operating reports, the Debtor testified it was not reported because this money from his parents "was different." (Tr. at 108). He explained the money was given to him by his parents to help with his living expenses because the money from his job was not enough to pay for everything. His parents typically gave him money to pay a particular bill or for a certain expense. Had the money been reported, the Debtor testified there would have been corresponding expenses to be reported as well.

When Ms. Black was asked whether the difference in the amount of receipts and the amount reported for the months of December 2014 through December 2015 could have been due to the Debtor's lack of knowledge of how to complete the reports, she admitted that for those particular months it would be possible. The Debtor, when explaining that his second attorney gave him more guidance on how to complete the reports than his first attorney, testified, "I took it on my own to [fill out the operating reports], and I'll be the first one to admit they're probably wrong, but I done the best that I knowed how to do it." (Tr. at 111).

### (2)  Transfer of the Residence

When the Debtor filed the Chapter 11 Case, his Residence was encumbered by a lien in favor of AgHeritage Farm Credit Services, FLCA ("**AgHeritage**").  On October 15, 2014, AgHeritage filed a proof of claim in the Chapter 11 Case in the amount of $1,005,469.79 (the "**POC**").  Another entity, Arnold Land Company, LLC (the "**Land Company**"), was the borrower in the loan documents.  The collateral for the claim included personal property as well as real estate located in both Lawrence County, Arkansas, and Craighead County, Arkansas.  The Craighead County properties included the Residence.[4]  The mortgage attached to the POC is signed by the Debtor and Paula Arnold as members of the Land Company, as well as the Debtor and Paula Arnold, as husband and wife.

The Land Company was also a debtor-in possession in a previous bankruptcy case, a Chapter 11 case filed on April 17, 2015, and dismissed on August 31, 2017 (the "**Arnold Land Case**").[5]  The Debtor introduced an order entered in the Arnold Land Case on July 31, 2015, which authorized the Land Company to sell certain real property to AFF, the entity owned by the Debtor's parents, and provided that AgHeritage "is ordered to release all mortgage liens against all real property securing its outstanding indebtedness . . . in consideration of payment of the outstanding mortgage debt." (Debtor Ex. D-1, at 1).  Ms. Black testified that the Residence was not listed as part of the real property being sold by this order.  A sale of property did take place and the closing was held at a title company with attorneys present for the Debtor, AgHeritage, AFF, and the Land Company.

---

[4] Although the POC was filed as an unsecured claim in the Debtor's Chapter 11 Case and a note to the POC indicated that AgHeritage believed the collateral on the loan was owned by a "liable entity other than the [D]ebtor," it is clear from the loan documents attached to the POC that the collateral included the Residence owned by the Debtor.

[5] Case No. 3:15-bk-11896, Eastern District of Arkansas, Northern Division.  The Court takes judicial notice of the docket sheet for the Arnold Land Case.

Twenty days after this order was entered, on August 20, 2015, AgHeritage filed an amended proof of claim in the Debtor's Chapter 11 Case reflecting a current claim balance of $0.00.  A notation on the amended proof of claim stated, "Claim has been paid in full by nondebtor with primary liability.  Collateral owned by other party and was sold & claim paid." (UST Ex. 15, at 1).  Although a legal description was not included in the order authorizing the sale in the Arnold Land Case, Ms. Black admitted that the debt on the Residence was satisfied through the sale in the Arnold Land Case.

The Debtor's version of the transfer of the Residence and the real estate transaction between the Land Company and AFF explains what transpired from his perspective.  The Debtor described the "situation" as one involving three assets—farmland, equipment, and the Residence—all three of which were collateral for the debt owed to AgHeritage.  (Tr. at 95).  The farmland was owned by the Land Company, and the equipment was owned by Coal Hill Farms, Inc., an entity owned 100% by the Debtor.  AgHeritage had demanded that the three assets, including the Residence, be sold in order to pay its claim.  The Debtor testified he was "getting pressure from AgHeritage to either pay [AgHeritage] off at a certain time or be foreclosed on by like 30 days."  (Tr. at 96).

Faced with the choice of trying to sell the assets or be foreclosed on, the Debtor went to his father to see if his parents, who the Debtor described as "wealthy enough" to buy the assets, were interested in buying the property.  (Tr. at 97).  His father was willing to buy the assets in order to help the Debtor and agreed to purchase the assets with a loan from Regions Bank, the only bank his father had used for his financing needs for the past fifty years.  The loan proceeds were to be paid directly to AgHeritage to pay off the debt encumbering the three assets.  His parents had other assets to use as collateral for the Regions Bank loan, and while it was not clear

7

from the evidence what assets they used as collateral for the loan, it was clear the Residence was not part of the collateral for the Regions Bank loan. The Debtor was certain that all three assets, including the Residence, were to be sold to his father in exchange for the AgHeritage debt being paid. The Debtor was adamant that his father also believed the Residence was included in the transaction.

After discussing the matter with his father, the Debtor and his father met with Ms. Robertson and discussed the details of the proposed transaction with her. The Debtor believed Ms. Robertson was taking care of the paperwork through the bankruptcy court and getting the necessary approvals. The Debtor described the day of the closing, noting every entity was represented by an attorney at the title company. After the paperwork was signed, his father told Ms. Robertson he "needed the deed to the house," and she responded, "Yes, you do, and I'll get it to you." (Tr. at 98).

There was a delay in getting the deed from Ms. Robertson. According to the Debtor his father kept asking about it and when the Debtor contacted Ms. Robertson about the deed she responded that she needed to start working on it and kept putting him off. Some time later, his father was in his own attorney's office and mentioned the problem of getting the deed prepared to his attorney, Dick Jarboe. Mr. Jarboe offered to prepare the deed and, after receiving the legal description, did prepare a warranty deed introduced into evidence by the UST.

The warranty deed reflects that on January 14, 2016, the Debtor, as grantor, transferred his interest in the Residence to AFF, the entity owned by the Debtor's parents, as grantee. The warranty deed was recorded in the real estate records of Craighead County, Arkansas, on January 14, 2016. There are no documentary tax transfer stamps on the warranty deed.

After the Debtor gave his version of the transfer of the Residence, he was asked whether there was a "court order approving the sale" of his Residence, and he responded he was not aware of one "because there was no need to single it out at the time," adding he "believed it was all under one—one roof, to say, all three of them, all three assets."  (Tr. at 105).

### (3)  Other Events in the Chapter 11 Case

The Debtor introduced evidence concerning other events in his Chapter 11 Case.  A little over one year into the case, on November 19, 2015, the UST filed a motion to dismiss the Chapter 11 Case alleging, *inter alia*, that the Debtor had failed to submit bank reconciliations to the UST, failed to report the reconciled balances on the operating reports, and failed to provide copies of check registers to the UST.  Ms. Black testified that although the Debtor filed all but one of his operating reports, reports are not considered complete until all supporting documentation is received.  The motion to dismiss was resolved by a consent order entered February 10, 2016, which withdrew the motion to dismiss on conditions.  The conditions included that the Debtor would, within fifteen days, file the monthly operating report for December 2015 and provide proof of insurance to the UST.  In addition, the Debtor was to file timely operating reports in the future, timely pay the quarterly fees due to the UST, and file his disclosure statement within forty-five days of the order.  Ms. Black testified that the Debtor complied with these conditions.

The Debtor's disclosure statement was filed March 28, 2016, and the UST objected to the adequacy of the disclosure statement.  An agreed order was entered on July 15, 2016, approving the disclosure statement and stating that the UST's objection was "resolved by agreement with Debtor [a]mending only Exhibit B to said Disclosure Statement to clarify the estimated annual income."  (Debtor Ex. D-4, at 1).  When asked whether it was "fair to arrive at a conclusion

. . . that based on the [D]ebtor's disclosure statement, apart from the annual income issue, the [UST] had no issues with the adequacy of the disclosure statement, including all of its other financial information," Ms. Black responded, "That seems to be what is represented in [the order]." (Tr. at 52).

After the Chapter 11 Case had been pending a little less than three years, on August 16, 2017, the UST filed a second motion to dismiss. The UST alleged in its second motion that the Debtor had failed to pay the UST quarterly fee and failed to file Form B26 periodic reports. In addition, the UST alleged that "the Debtor's net income is not enough to successfully complete the payments he has proposed in his plan of reorganization." (Debtor Ex. D-5, at 2). Nothing was alleged as to any deficiencies with the Debtor's monthly operating reports. The Debtor agreed that his income decreased after the Chapter 11 Case was filed, and he was unable to reorganize. He explained that he farmed land owned by others and after filing bankruptcy, some of the landowners decided they no longer wanted to allow him to farm on their land. Once he realized he was not going to be able to reorganize, he knew he needed to file a Chapter 7 case. So, on August 31, 2017, an order was entered dismissing the Chapter 11 Case by consent.

**C.  Chapter 7 Case**

Twenty days after the Chapter 11 Case was dismissed, the Debtor initiated the current bankruptcy case by filing a voluntary petition for relief under Chapter 7 of the Bankruptcy Code (the "**Chapter 7 Case**").[6] The Debtor listed the Residence on the Chapter 7 petition as his current residence, but he did not list the Residence as an asset in his schedules or amended schedules, nor was any other real estate listed. The Debtor did not exempt any real property on his original or amended Schedule C. Personal property assets listed in the amended schedules

---

[6] Case No. 3:17-bk-15107, Eastern District of Arkansas, Northern Division.

were valued at $68,800.00 and liabilities totaled $1,498,358.01.  The liabilities were primarily business debts.  The Debtor listed his interest in four entities in his amended schedules including a 100% ownership interest in the Land Company.[7]

On his SOFA, in response to Question 18 concerning transfers made within two years of the filing of his bankruptcy petition, the Debtor indicated that in 2015 he "sold house to parents during pendency of Chapter 11 case pursuan[t] to court order" and identified his parents as Bob and Joan Arnold.  (UST Ex. 5, at 36).  Katherine Black testified that no order was entered in the Chapter 11 Case authorizing the sale of the Debtor's Residence.  And, although the UST argues that the Debtor's statement about the transfer to his parents in his SOFA was a false statement, Ms. Black admitted the Debtor had indeed disclosed the transfer of the Residence in his SOFA.

The Chapter 7 Trustee testified that he conducted both the Debtor's initial 341(a) meeting and a follow-up 341(a) meeting in the Chapter 7 Case.  The Debtor and his attorney were present at both meetings, and the Debtor was examined under oath.  At the 341(a) meetings, the Debtor stated he reviewed and signed his petition, schedules, and SOFA, and the information was true and correct to the best of his knowledge.  When asked if he transferred any property to anyone in the three years before filing bankruptcy, the Debtor responded, "No" but answered, "Right" when the Chapter 7 Trustee stated, "I'm going to represent to you that in your [SOFA] you stated that you sold your homestead and three acres to your parents in 2015."  (Tr. at 67–68).

At trial, during direct examination by the UST's counsel, the following colloquy took place:

> Q:      [Reading from a transcript of the Debtor's 341(a)

[7] The Debtor's original schedules listed his ownership interest in the Land Company at 50%.  When asked if there were any changes to be made to the schedules or SOFA at his 341(a) meeting, he acknowledged that his ownership interest in the Land Company needed to be changed from 50% to 100% due to his divorce settlement.

11

meeting]  All right.  At line number 15, Mr. Mitchell asked:

>    "Did you transfer property to anyone within the last three years before you filed?"

And do you see what your response was?

A:        "No."

Q:        All right.  And, Mr. Arnold, did you make any transfers within three years of filing your Chapter 7 case?

A:        No.

Q:        Did you transfer your homestead to the LLC that was owned by your mother and father?

A:        Did I transfer?  I guess I'm getting confused.  I don't understand the question.

. . . .

Q:        Mr. Arnold, within three years prior to your Chapter 7 filing, did you transfer any property to anyone outside the normal course of business?

A:        No.

. . . .

Q:        [Referring the witness to UST Exhibit 9, the warranty deed from the Debtor to AFF]

So, is it correct that you—this deed represents that you, Mr. Arnold, transferred your homestead to [AFF]?

A:        It—you're saying transfer.  The property was sold. Now, if you want to call that a transfer, that's fine. But, as here trying to answer your question, we need to be clear what—what we're talking about.

(Tr. at 93–95).

12

The Chapter 7 Trustee testified that it was a distinct possibility that if he had solely relied on the Debtor's statements in his schedules, SOFA, and at the 341(a) meetings he would have been misled regarding the Residence. He admitted, however, that he was "placed on notice" of the transfer because it was listed in the SOFA in the Chapter 7 Case. (Tr. at 83). Because it was listed, he obtained a copy of the deed from the Debtor to AFF and reviewed the Chapter 11 Case and Arnold Land Case for court authority for the transfer prior to conducting the Debtor's initial 341(a) meeting.

The Chapter 7 Trustee testified that it was his standard practice to review any prior bankruptcy case information if a debtor had been in a previous case. He did review the Debtor's previous case filings and did not recall anything unusual. His review of the Chapter 11 Case included a thorough review and investigation of the information contained in the monthly operating reports.

After investigating the transfer of the Residence, the Chapter 7 Trustee concluded that the Residence had been transferred without court approval in the Chapter 11 Case and for no consideration. Based on this information, on November 17, 2017, the Chapter 7 Trustee initiated an adversary proceeding against AFF to avoid the transfer of the Residence for the benefit of the bankruptcy estate.

The Chapter 7 Trustee and two creditors also filed an adversary proceeding objecting to the Debtor's discharge. All the parties involved in these two adversary proceedings entered into a compromise settlement agreeing that AFF would transfer its interest in the Residence to the bankruptcy estate and the Debtor would, in turn, purchase the Residence for the purchase price of $250,000.00. AFF warranted in the settlement agreement that it had not "transferred, mortgaged or otherwise encumbered" the Residence since it was deeded the property from the

13

Debtor.  (UST Ex.18, at 7).  Also, as part of the compromise settlement, both adversary proceedings were to be dismissed with prejudice.  The compromise settlement was approved by this Court, the Residence was transferred to the bankruptcy estate, and the Debtor purchased the Residence for $250,000.00.

The Chapter 7 Trustee received a total of $271,850.00 for distribution in the Chapter 7 Case.  Unsecured creditors received a distribution of slightly more than ten percent, an amount the Chapter 7 Trustee believed was a reasonable, meaningful distribution to creditors.

### III.  Arguments

The UST argues the Debtor's discharge should be denied pursuant to 11 U.S.C. § 727(a)(2), (a)(3), (a)(4), and (a)(7).  The UST's arguments are summarized below.

### A.  Count I - Concealment under Section 727(a)(2) and (a)(7)

As to Section 727(a)(2) and (a)(7), the UST argues the Debtor, with intent to hinder, delay, or defraud a creditor or officer of the estate, transferred and concealed the transfer of his Residence.  The transfer occurred while the Chapter 11 Case was pending and was not disclosed in the Debtor's operating reports or in his tax returns.

The UST argues the concealment of the Residence originated in the Chapter 11 Case but continued in the Chapter 7 Case because after the Chapter 11 Case was dismissed and the Chapter 7 Case was filed, the Debtor incorrectly disclosed the facts concerning the transfer of the Residence in his SOFA, which has not been amended to correct the misinformation, and the Debtor also misrepresented the transfer at his 341(a) meetings.  The UST argues that had the Chapter 7 Trustee taken the Debtor's statement in his SOFA and statements made at the 341(a) meetings regarding the transfer as true, the transfer may not have been recovered for the benefit of the bankruptcy estate.

In response, the Debtor argues that the transfer of the Residence was disclosed in the Debtor's Chapter 7 Case, the transfer occurred more than one year prior to the filing of the Chapter 7 Case, and any transfer made by the Debtor was made without the requisite intent to defraud.

### B.  Count II - Concealed and Falsified Records under Section 727(a)(3) and (a)(7)

As to Section 727(a)(3) and (a)(7), the UST argues the Debtor engaged in "intentional concealment and falsification" by concealing the transfer of the Residence in the Chapter 11 Case and testifying at the 341(a) meetings that his schedules and statements were true and correct.  (UST Post-Trial Br., at 7).  The UST further argues the Debtor's failure to disclose income from his parents in the monthly operating reports filed in his Chapter 11 Case resulted in the financial information being false and is evidence of "bad conduct and [a] pattern of concealment."  (UST Post-Trial Br., at 4).

In response, the Debtor argues the UST's argument is misplaced.  The Debtor argues that under Section 727(a)(3) the issue is whether there is a lack of records from which the Debtor's financial condition can be ascertained and the UST has not met his burden on this element.  In addition, the Debtor argues that any information not provided by the Debtor is "*de minimis* in volume and immaterial to a denial of discharge analysis" in the Debtor's Chapter 7 Case. (Debtor Post-Trial Br., at 2).

### C.  Count III - False Oath or Account under Section 727(a)(4)(A) and (a)(7)

Finally, as to Section 727(a)(4) and (a)(7), the UST argues the Debtor knowingly and fraudulently transferred the Residence in his Chapter 11 Case without court authority and then misrepresented the transfer in the Chapter 7 Case in his schedules and in testimony at his 341(a) meetings, satisfying the elements for denial of discharge under Section 727(a)(4).  The UST

15

argues that the concealment of the transfer of the Residence and the failure to report income from

his parents on the operating reports are evidence of badges of fraud sufficient to prove fraudulent

intent.

In response, the Debtor argues again that he did disclose the transfer of the Residence in

his SOFA, and the evidence does not support a denial of discharge under Section 727(a)(4).  Any

false statement made, he argues, was unintentional and immaterial.

### IV.  Discussion

As courts have widely noted, denying a debtor's discharge is a "harsh remedy," and for

that reason, courts must construe complaints objecting to discharge strictly in favor of the

debtor.  *Snyder v. Dykes (In re Dykes)*, 590 B.R. 904, 909 (B.A.P. 8th Cir. 2018) (citing *Korte v.

I.R.S. (In re Korte)*, 262 B.R. 464, 471 (B.A.P. 8th Cir. 2001)), *aff'd*, 954 F.3d 1157 (8th Cir.

2020).  "The reasons for denying a discharge . . . must be real and substantial, not merely

technical and conjectural." *McDermott v. Petersen (In re Petersen)*, 564 B.R. 636, 645 (Bankr.

D. Minn. 2017) (quoting *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 110 (1st Cir. 1987)).   The

UST has the burden of proving the elements of his causes of action "by a preponderance of the

evidence" for the Debtor's discharge to be denied.  *In re Dykes*, 590 B.R. at 909.  Each of the

UST's causes of action will be discussed separately below.

### A.  Section 727(a)(7)

Section 727(a)(7) provides that a debtor's discharge will be denied if "the debtor has

committed any act specified in paragraph (2), (3), (4), (5), or (6) of this subsection, on or within

one year before the date of the filing of the petition, or during the case, in connection with

another case, under this title . . . concerning an insider."  11 U.S.C. § 727(a)(7).  Courts have

explained the purpose of this section is:

> to prevent debtors who are involved in several bankruptcy proceedings from failing to cooperate in a proceeding in which their own discharge is not at issue, such as a corporate proceeding or a proceeding involving a partner or a relative and then, subsequently or simultaneously, obtain an individual discharge in another case. Section 727(a)(7) is a statutory provision which ties related cases together so that misconduct in one case by an individual may be chargeable against that individual in other related proceedings.

*Gresk v. Bulmer (In re Bulmer)*, No. 15-50153, 2017 WL 562436, at *7 (Bankr. S.D. Ind. Feb. 10, 2017) (quoting *Whiteside F.S. Inc. v. Siefkin*, 46 B.R. 479, 480–81 (N.D. Ill. 1985)).

To prevail under Section 727(a)(7), the UST must prove the Debtor: "1) on or within one year before the date of the filing of the petition, or at any time during the [D]ebtor's own case, 2) commit[ted] any of the objectionable acts specified in subsection 727(a)(2), (3), (4), (5), or (6), 3) in connection with another case concerning an insider." *First Neb. Bank v. Poppe (In re Poppe)*, No. A16-4019, 2017 WL 27924, at *3 (Bankr. D. Neb. Jan. 3, 2017).

It is unnecessary for the Court to evaluate the first two elements because the third element is not met in this case. The third element the UST must prove is that the Debtor committed the requisite acts "in connection with another case, under this title . . . *concerning an insider.*" 11 U.S.C. § 727(a)(7) (emphasis added). Section 101(31)(A) of the Bankruptcy Code provides that if the debtor is an individual the term "insider" includes the following: "(i) relative of the debtor or of a general partner of the debtor; (ii) partnership in which the debtor is a general partner; (iii) general partner of the debtor; or (iv) corporation of which the debtor is a director, officer, or person in control." 11 U.S.C. § 101(31)(A)(i)–(iv).

The UST seeks a denial of the Debtor's discharge based on the Debtor's actions in the Chapter 11 Case and the Chapter 7 Case. Anthony G. Arnold was the debtor-in-possession in the Chapter 11 Case and is the debtor in the Chapter 7 Case. The Debtor cannot be an insider of himself. *See, e.g., Whiteside*, 46 B.R. at 481 (affirming bankruptcy court's finding that an

17

"insider under Section 727(a)(7) does not include the same individual . . . who [was] involved in a prior case"); *In re Bulmer*, 2017 WL 562436, at *7 (finding for purposes of Section 727(a)(7) "the Debtor is not an insider of himself"); *Rupp v. Pearson (In re Pearson)*, No. 14-2020, 2014 WL 3051211, at *3 (Bankr. D. Utah July 3, 2014) ("The statutory language does not admit the possibility that a debtor could be an insider of herself.").

Here, the prior case asserted by the UST was the Debtor's own individual bankruptcy case so none of the bad acts alleged by the UST were committed "in connection with another case . . . concerning an insider" as required by Section 727(a)(7).  11 U.S.C. § 727(a)(7); *see also In re Bulmer*, 2017 WL 562436, at *7; *In re Pearson*, 2014 WL 3051211, at *3.  For these reasons, the Debtor's actions in the Chapter 11 Case cannot meet the requirements of Section 727(a)(7).

In addition, none of the other individuals or entities discussed at trial provide the necessary connection to invoke the insider requirement of Section 727(a)(7).  The transfer of the Residence was to AFF, an entity owned by the Debtor's parents, but there was no evidence presented that AFF or the Debtor's parents were in bankruptcy at the time.  *See In re Poppe*, 2017 WL 27924, at * 3 (denying relief under Section 727(a)(7) where there were "no allegations concerning non-dischargeable conduct pertaining to a [bankruptcy] case *of* an insider") (emphasis added); *but see Strauss v. Brown (In re Brown)*, 531 B.R. 236, 266 (Bankr. W.D. Mo. 2015).  In addition, although there was evidence that the Debtor was an insider of the Land Company, there was no evidence of the Debtor committing any of the specified acts in connection with the Arnold Land Case.

For the reasons stated, the Court finds the facts do not support a finding or conclusion that the Debtor committed any bad act in connection with another case concerning an insider, and the UST's complaint as to Section 727(a)(7) must be denied.

Although the Court has found that Section 727(a)(7) does not apply to the facts in this case, the analysis does not end here. The UST also argues the Debtor's discharge should be denied in connection with the Chapter 7 Case under Section 727(a)(2), (a)(3), and (a)(4)(A). The analysis for each cause of action is discussed below.

### B. Section 727(a)(2)

Under Section 727(a)(2), a debtor's discharge will be denied if "the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate . . . has transferred, removed, destroyed, mutilated, [or] concealed . . . (A) property of the debtor, within one year before the date of the filing of the petition; or (B) property of the estate, after the date of the filing of the petition." 11 U.S.C. § 727(a)(2)(A)–(B). The UST does not specify whether he objects to the Debtor's discharge under Section 727(a)(2)(A) or (a)(2)(B). The Court will address both.

### *(1)  Section 727(a)(2)(A)*

To prevail on a Section 727(a)(2)(A) claim, the UST must show by a preponderance of the evidence: "(1) that the act complained of was done within one year prior to the date of petition filing; (2) the act was that of the debtor; (3) it consisted of a transfer, removal, destruction or concealment of the debtor's property; and (4) it was done with an intent to hinder, delay, or defraud either a creditor or an officer of the estate." *In re Korte*, 262 B.R. at 472.

The UST argues the transfer of the Residence occurred during the Chapter 11 Case but was not disclosed, and the concealment continued in the Chapter 7 Case. For the reasons stated

below, the UST failed to meet his burden of proof as to the first and fourth elements under

Section 727(a)(2)(A).

### (a) *Act committed within one year prior to the bankruptcy filing*

The first element the UST must prove is that the act complained of was done within one

year prior to the date the Chapter 7 Case was filed.  There is no dispute the Debtor transferred his

Residence to AFF more than one year before the filing of the Chapter 7 Case.  In fact, the deed

transferring the Residence from the Debtor to AFF was recorded on January 14, 2016, and the

Chapter 7 Case was not filed until September 20, 2017.

The UST argues, however, that although the transfer occurred more than one year prior to

the filing of the Chapter 7 Case, the doctrine of continuing concealment brings the act within the

one-year limitation period of Section 727(a)(2)(A).  In support of his argument, the UST asserts

that the Debtor concealed the transfer of the Residence by transferring his Residence without

Court approval during the Chapter 11 Case, failing to disclose the transfer of the Residence in his

monthly operating reports and tax returns, and misrepresenting the transfer in the SOFA filed in

his Chapter 7 Case and at the Debtor's 341(a) meetings in the Chapter 7 Case.  The argument

made by the UST based on these assertions is that the Debtor's discharge should be denied due

to the Debtor's continuing concealment *of the transfer* of the Residence, not a continuing

concealment of the Residence itself.  The UST's application of the doctrine of continuing

concealment as to his Section 727(a)(2)(A) action is misplaced.

"[C]oncealment is a continuing event and under the established doctrine of 'continuing

concealment,' a concealment that originated outside the one year limitation period is within the

reach of § 727(a)(2)(A) if the concealment continued on into the year preceding the filing

coupled with the requisite intent."  *In re Korte*, 262 B.R. at 472 (quoting *Kaler v. Craig (In re*

20

*Craig)*, 195 B.R. 443, 449 (Bankr. D.N.D. 1996)).  "What is critical under the concealment

provision of § 727(a) is whether there is concealment of *property*, not whether there is

concealment of a transfer."  *In re Petersen*, 564 B.R. at 645–46 (quoting *Rosen v. Bezner*, 996

F.2d 1527, 1532 (3d Cir. 1993)).  "[T]he concealment contemplated by the statute is not just an

amorphous, free-floating concept of hiding something, but the very specific act of a concealment

of property of the Debtor."  *Melaragno v. Lybrook (In re Lybrook)*, 544 B.R. 537, 549 (Bankr.

W.D. Pa. 2015).

　　　In a case with similar facts, *In re Lybrook*, the debtor had already transferred certain

property and failed to disclose the transfers on her SOFA and at her first meeting.  The court

explained the following in its Section 727(a)(2)(A) analysis: "By her SOFA omissions and false

statements at the [m]eeting of [c]reditors, the [d]ebtor was not concealing property of the estate,

because the property in question had already been transferred, she was concealing the transfers.

That is not sufficient to trigger the statute."  *In re Lybrook*, 544 B.R. at 549 (citing *Rosen*, 996

F.2d at 1532).

　　　Similarly, here, the UST is focused on the concealment of the *transfer* of the Residence,

not concealment of the Residence itself.  The continuing concealment doctrine does not apply.

The UST failed to meet his burden of proof as to the first element.

*(b)　Intent to hinder, delay, or defraud*

　　　The UST also failed to meet his burden to prove the Debtor acted with an intent to hinder,

delay, or defraud either a creditor or an officer of the estate.  "While the objecting [party] need

not show fraudulent intent on the debtor's part to succeed on a § 727(a)(2)(A) claim, it must

show the debtor acted with actual intent to hinder, delay, or defraud a creditor."  *In re Korte*, 262

B.R. at 472 (citing *Fox v. Schmit (In re Schmit)*, 71 B.R. 587, 590 (Bankr. D. Minn. 1987)).

"[A]ctual intent may be inferred from the facts and circumstances of the debtor's conduct." *Id*. at 472–73. "Such facts and circumstances are most commonly referred to as 'badges of fraud.'"[8] *Dantzler v. Zulpo (In re Zulpo)*, 592 B.R. 231, 247 (Bankr. E.D. Ark. 2018) (citing *Luker v. Eubanks (In re Eubanks)*, 444 B.R. 415, 422–23 (Bankr. E.D. Ark. 2010)).

"Courts generally require a 'confluence' of several badges of fraud" for a presumption of the requisite intent to arise; the existence of a single badge is not sufficient. *Id*. (citing *In re Eubanks*, 444 B.R. at 422–23). "However, if the presumption arises, the burden of production shifts to the debtor to show a 'legitimate supervening purpose' of the transfer." *Id*. (quoting *In re Eubanks*, 444 B.R. at 423). A debtor who transfers or otherwise conceals property with the requisite intent is barred a discharge. 11 U.S.C. § 727(a)(2).

The UST asserts the transfer of the Residence without court authority, the concealment of the transfer on the monthly operating reports filed in the Chapter 11 Case, the failure to properly disclose the transfer on the SOFA filed in the Chapter 7 Case, and the false statements at the 341(a) meetings regarding the transfer of the Residence are evidence of badges of fraud that rise to the level of actual intent. In addition, the UST asserts that the Debtor's failure to disclose all monthly income received from AFF on the monthly operating reports filed in connection with the Chapter 11 Case is evidence of fraud.

---

[8] The badges include the following eleven factors:

> (1) lack or inadequacy of consideration; (2) family, friendship or other close relationship between transferor and transferee; (3) retention of possession, benefit or use of the property in question; (4) financial condition of the transferor prior to and after the transaction; (5) conveyance of all the debtor's property; (6) secrecy of the conveyance; (7) existence of trust or trust relationship; (8) existence or cumulative effect of pattern or series of transactions or course of conduct after the pendency or threat of suit; (9) instrument affecting the transfer suspiciously states it is bona fide; (10) debtor makes voluntary gift to family member; and (11) general chronology of events and transactions under inquiry.

*In re Zulpo*, 592 B.R. at 247 n.7 (quoting *Helena Chem. Co. v. Richmond (In re Richmond)*, 429 B.R. 263, 305 (Bankr. E.D. Ark. 2010)).

As further explained below, the Court does not believe the evidence introduced at trial supports a finding that the Debtor had an intent to hinder, delay, or defraud a creditor or an officer of the estate either at the time the transfer of the Residence occurred or when the transfer was misrepresented on his SOFA. Nor does the testimony at the 341(a) meetings support such a finding. Instead, we have a Debtor who filed substantially all his operating reports on time, went to his attorney to obtain court approval for a sale of assets in his bankruptcy cases, complied with all conditions of a previous order on the UST's motion to dismiss, and who was trying to satisfy the requirements of a secured creditor about to foreclose on his property.

Indeed, the Debtor's version of the sale of the property to AFF was both credible and corroborated by other evidence. AgHeritage was pressuring the Debtor to sell the farmland, the equipment, *and the Residence* to pay off AgHeritage's loan. The Debtor was given only thirty days to accomplish the sale or face foreclosure. Knowing his parents had the wherewithal to obtain the funds to pay off AgHeritage, the Debtor went to them for help. All three assets were at risk of foreclosure by AgHeritage, and the Court is not convinced by the evidence that the Debtor would have offered to transfer only two of the three assets to his parents for them to pay a debt secured by all three as suggested by the UST's argument. In addition, the release of the mortgage lien on the Residence at the time of the transfer further corroborates the Debtor's version of the transaction.

There was no evidence of an intent to do anything other than obtain Court approval for the transfer of all three assets, including the Residence. After discussing AgHeritage's threat of foreclosure with his father, the Debtor and his father met with Ms. Robertson to discuss the proposed transaction with her. The transaction involved property owned by the Land Company and property owned by the Debtor. Both were in Chapter 11 bankruptcy proceedings and Ms.

23

Robertson was the attorney for the debtor-in-possession in the Arnold Land Case and the attorney for the Debtor in his Chapter 11 Case.[9]  The Debtor trusted Ms. Robertson to file the appropriate documents and obtain the necessary approval for the transactions to close.  Indeed, Ms. Robertson did file motions, noticed out the sale, and obtained court approval for the sale of real property from the Land Company to AFF but failed to file documents in the Debtor's Chapter 11 Case for the sale of the Residence.  The evidence supports a conclusion that the Debtor did believe that all three assets were involved in the 2015 closing and believed his attorney had handled the appropriate paperwork for all three.

The Court also finds the Debtor's undisputed testimony about the closing of the transaction credible.  The Debtor's parents apparently had assets sufficient to collateralize the loan from Regions Bank to pay off AgHeritage without having to include the Residence as part of the collateral.  The Debtor's undisputed testimony was that Bobby Arnold requested the deed to the Residence after the closing and Ms. Robertson indicated she would, in fact, prepare the deed.  There was a delay in Ms. Robertson's actions, but the fact that she was physically ill enough to require her to withdraw from representing her client in an individual Chapter 11 bankruptcy proceeding lends credence to the Debtor's testimony that she was not taking care of matters in his bankruptcy case during this time frame.

In watching the Debtor's demeanor on the stand and tying much of his testimony to other evidence, the Court believes his testimony that his father discussed the problem the Debtor was having in getting Ms. Robertson to prepare a deed to the Residence with Dick Jarboe and believes Mr. Jarboe would offer to prepare the deed.  The deed was finally prepared five months after the closing, but the Court finds the evidence supports the conclusion that the Debtor did

---

[9] The Court takes judicial notice of counsel for the Land Company on the docket sheet in the Arnold Land Case.

believe he sold his Residence to his parents (or AFF) during the closing that took place at the title company in 2015 in exchange for his parents (or AFF) paying off the debt to AgHeritage.

As to the Debtor's failure to disclose the transfer of the Residence in his monthly operating reports, the Court finds the Debtor's testimony credible.  The Debtor prepared the operating reports himself.  Although the Debtor had some college education, it was clear from the testimony that the operating report form was confusing to the Debtor and difficult for him to complete.  In addition, the form is designed to show monthly operating cash receipts and expenses.  There was not a place on the form inquiring about any transfers made during the reporting month that would alert the Debtor to disclose such a transfer.  Furthermore, the Debtor had no "cash receipts" to report on the form from the transfer of the Residence because the consideration he received for the transfer was not in the form of cash; instead, his obligation owed to a third party secured by the Residence was to be paid as part of a larger liquidating transaction.  The transfer deed was recorded on January 14, 2016.  It became a matter of public record during the pendency of the Chapter 11 Case, representing to the world that the Debtor transferred his interest in the property.

As to the way the transfer was disclosed on the Debtor's SOFA in the Chapter 7 Case, the Court again finds the evidence weighs in favor of the Debtor.  In his SOFA, the Debtor disclosed that in 2015 he "sold [his] house to parents during pendency of Chapter 11 case pursuan[t] to court order" and identified his parents as Bob and Joan Arnold.  (UST Ex. 5, at 36).  The Court finds the overwhelming weight of the evidence proves the Debtor believed this disclosure to be accurate.  In fact, the evidence supports a finding that the Debtor believed the Residence was transferred as part of the transaction where the Land Company sold real property to AFF in order to pay off AgHeritage, and he disclosed the transfer on his SOFA.

25

The Debtor's demeanor on the stand and responses to questions lead this Court to find that Mr. Anthony G. Arnold is an honest, hardworking debtor.  As clearly indicated by the colloquy quoted from the trial, the Debtor did not understand the distinction between his Residence being "sold" and being "transferred."  The testimony at the 341(a) meeting reflects the Debtor's misunderstanding of the legal terminology used instead of an intent to defraud.  He readily agreed any time he was asked about selling the Residence to AFF instead of transferring the asset that he did, in fact, sell the Residence to his parents.  It follows that the Debtor's statements at the 341(a) meeting also fail to rise to the level of a secret interest or false statement to conceal the transfer of the Residence.  Again, the evidence supports a finding that the Debtor, in fact, thought the sale of his Residence to AFF (his parents) was part of the 2015 transaction.

To the extent the UST argues the Debtor's failure to list all income from AFF on his monthly operating reports in the Chapter 11 Case is an additional badge of fraud to be considered, the Court again disagrees.  When asked about the additional income not reported on his monthly operating reports the Debtor testified it was not reported because this money from his parents "was different."  (Tr. at 108).  He explained the money was given to him by his parents to help with his living expenses because the money from his job was not enough to pay for everything.  His parents typically gave him money to pay a particular bill or for a certain expense.  Had the money been reported, the Debtor testified there would have been corresponding expenses to be reported as well.  The Debtor's testimony was credible and the evidence presented by the UST was insufficient to prove an intent to hinder, delay, or defraud a creditor or officer of the estate.

For the reasons stated above, the Court finds the UST failed to meet his burden of proving the fourth element that the Debtor had an intent to hinder, delay, or defraud a creditor or

26

an officer of the estate.  Based on the evidence presented, the Court does not find a presumption of actual intent ever arose in this case.  But even if it had, the Debtor would have rebutted the presumption by giving a legitimate supervening purpose for the transfer.  The Debtor sufficiently explained the transaction involving the transfer of the Residence and the reason for his failure to disclose all funds received from AFF in his monthly operating reports.  The Court finds the Debtor did not act with an intent to hinder, delay, or defraud a creditor or officer of the estate.  Because the UST failed to prove the first and fourth elements of Section 727(a)(2)(A), his cause of action under this section fails.

### *(2) Section 727(a)(2)(B)*

Under Section 727(a)(2)(B), a debtor's discharge will be denied if "the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate . . . has transferred, removed, destroyed, mutilated, or concealed . . . property of the estate, after the date of the filing of the petition."  11 U.S.C. § 727(a)(2)(B).  The elements of Section 727(a)(2)(B) are identical to the elements of Section 727(a)(2)(A), except that the offending action must have occurred postpetition and must have involved property of the estate.  *In re Zulpo*, 592 B.R. at 243.

As under Section 727(a)(2)(A), one of the elements the UST must prove under Section 727(a)(2)(B) is that the act was committed with an intent to hinder, delay, or defraud either a creditor or an officer of the estate.  *Id*.  For the reasons stated in Part IV.B.(1)(b) above, the Court has found the UST failed to meet his burden of proving the requisite intent.  His cause of action under Section 727(a)(2)(B) must also fail.

### C.  Section 727(a)(3)

Under Section 727(a)(3), a debtor's discharge will be denied if he has "concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including

books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case."  11 U.S.C. § 727(a)(3).

Under Section 727(a)(3), the UST must show: "(1) that the debtor failed to maintain and preserve adequate records, and (2) that such failure makes it impossible to ascertain the debtor's financial condition and material business transactions."  *Snyder v. Dykes (In re Dykes)*, 954 F.3d 1157, 1163 (8th Cir. 2020) (quoting *Meridian Bank v. Alten*, 958 F.2d 1226, 1232 (3d Cir. 1992)).  "The test is 'whether there is available written evidence made and preserved from which the present financial condition of the bankrupt, and his business transactions for a reasonable period in the past may be ascertained.'"  *Id*. (quoting *Meridian Bank*, 958 F.2d at 1230). "The debtor is required to take such steps as ordinary fair dealing and common caution dictate to enable the [UST] to learn what he did with his estate."  *Id.* (quoting *Davis v. Wolfe (In re Wolfe)*, 232 B.R. 741, 745 (B.A.P. 8th Cir. 1999)).

If the UST meets his initial burden, "the burden of production shifts to the debtor to offer a justification for his record keeping (or lack thereof); however, the objecting party bears the ultimate burden of proof with respect to all elements of this claim."  *Id*.  (quoting *McDermott v. Swanson (In re Swanson)*, 476 B.R. 236, 240 (B.A.P. 8th Cir. 2012)).

Unlike other provisions of Section 727, Section 727(a)(3) "does not require proof of intent."  *Id*.  (citing *In re Wolfe*, 232 B.R. at 745).  "Rather, the standard under this provision is one of reasonableness."  *In re Zulpo*, 592 B.R. at 237 (citing *In re Wolfe*, 232 B.R. at 745).  "In determining whether a debtor's record keeping was justified, the Bankruptcy Code 'requires the trier of fact to make a determination based on all the circumstances of the case.'"  *In re Dykes*, 954 F.3d at 1163 (quoting *Meridian Bank*, 958 F.2d at 1231).  Courts should evaluate factors

such as "the education, experience, and sophistication of the debtor; the volume and complexity

of the transactions; and 'any other circumstances that should be considered in the interest of

justice.'" *Id*. (quoting *Meridian Bank*, 958 F.2d at 1231).  The bankruptcy court enjoys "broad

discretion in assessing the relevant facts of the case.  *Anderson v. Wiess (In re Wiess)*, 132 B.R.

588, 592 (Bankr. E.D. Ark. 1991) (first citing *G & J Invs. v. Zell (In re Zell)*, 108 B.R. 615

(Bankr S.D. Ohio 1989); and then citing *Forstall v. McCall (In re McCall)*, 76 B.R. 490, 497

(Bankr. E.D. Pa. 1987)).

     The UST seeks denial of the Debtor's discharge under Section 727(a)(3) asserting two

arguments.  First, he argues the Debtor engaged in "intentional concealment and falsification" by

concealing the transfer of the Residence in the Chapter 11 Case and testifying at the 341(a)

meetings that his schedules and statements were true and correct.  Second, he argues the

Debtor's failure to disclose income from his parents in the monthly operating reports filed in his

Chapter 11 Case resulted in the financial information being false and evidenced "bad conduct

and [a] pattern of concealment."  (UST Post-Trial Br., at 4).

     The UST's first argument is misplaced.  The UST was required to show the Debtor failed

to maintain and preserve adequate records which made it impossible to ascertain his financial

condition and material business transactions.  The transfer of the Residence was a matter of

public record; the deed was recorded in the Craighead County real property records on

January 14, 2016.  Furthermore, the transfer was disclosed in the current Chapter 7 Case, both in

the SOFA and at the 341(a) meetings, although the representations of it being made pursuant to

court order were inaccurate.  The UST failed to show the Debtor concealed records regarding the

transfer of the Residence, and further failed to establish it was impossible to ascertain the

Debtor's financial condition or business transactions as a result of the Debtor's conduct.  In fact,

the evidence revealed that the Debtor's disclosure of the transfer in the Chapter 7 Case ultimately led to the Chapter 7 Trustee being able to recover the asset for the benefit of the estate.

To the extent the UST argues the Debtor's actions were intentional, the Court has already addressed this assertion in Part IV.B.(1)(b), above.  The Court found the Debtor did not intentionally conceal the transfer of the Residence or intentionally make false statements at his first meetings or in his SOFA concerning the transfer of his Residence.  Moreover, intent is not an element under Section 727(a)(3).  *In re Dykes*, 954 F.3d at 1163.  For all of these reasons, the Court finds the UST failed to meet his initial burden under Section 727(a)(3) as to his first argument, and his claim must fail.

As to the second argument regarding the Debtor's failure to disclose income from his parents in the monthly operating reports filed in his Chapter 11 Case, the Court finds the UST's claim must also fail.  As also discussed above in Part IV.B.(1)(b), the Court found the Debtor credible when he discussed the reasons for not disclosing the additional funds from his parents (AFF).  He explained that had the money been reported as income there would have been corresponding expenses to be reported as well.  Therefore, the nondisclosure did not hinder the trustee or creditors from ascertaining his financial condition.  The Court finds the UST failed to meet his initial burden.  *See In re Dykes*, 954 F.3d at 1163.

In any event, even if the UST had met his initial burden to show that the Debtor failed to maintain or preserve adequate records from which his financial condition could be ascertained, the Debtor met his burden to show that his record keeping was reasonable under the circumstances.  The Debtor testified that he kept detailed personal financial records; that he maintained his crop receipts and receipts for expenses such as seed, fertilizer, labor, and tractor

and machinery repairs; and that he took this information to his accountant, Jimmy Wilson, on a quarterly basis.  Mr. Wilson took care of the Debtor's books and prepared his tax returns.  No evidence was introduced to dispute this testimony or to prove that any of these records were concealed, destroyed, mutilated, or falsified.

For the reasons stated, the Court finds the UST has not met his burden of proving the Debtor's discharge should be denied under Section 727(a)(3), and his claim must fail.

**D.  Section 727(a)(4)(A)**

Lastly, the Court will discuss the allegations of false oaths or accounts that the UST raises as an objection to the Debtor's discharge under 11 U.S.C. § 727(a)(4)(A).  Under this section, a debtor's discharge will be denied if "the debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account."  11 U.S.C. § 727(a)(4)(A).

"Section 727(a)(4)(A) 'provides a harsh penalty for the debtor who deliberately secretes information from the court, the trustee, and other parties in interest in his case.'"  *In re Korte*, 262 B.R. at 474 (quoting *Cepelak v. Sears (In re Sears)*, 246 B.R. 341, 347 (B.A.P. 8th Cir. 2000)).  The debtor must provide "full and complete disclosure of any and all apparent interests of any kind."  *Id*. (quoting *Fokkena v. Tripp (In re Tripp)*, 224 B.R. 95, 98 (Bankr. N.D. Iowa 1998)).  "The debtor's 'petition, including schedules and statements, must be accurate and reliable, without the necessity of digging out and conducting independent examinations to get the facts.'"  *Id*. (quoting *In re Sears*, 246 B.R. at 347).

To prevail under Section 727(a)(4)(A), the UST must prove the following elements: "(1) the debtor made the statement under oath; (2) the statement was false; (3) the statement was made with fraudulent intent; (4) the debtor knew the statement was false; and (5) the statement related materially to the debtor's bankruptcy."  *TLR Coffee House, Inc. v. Cooper (In re Cooper)*,

31

399 B.R. 637, 646 (Bankr. E.D. Ark. 2009) (citing *Jacoway v. Mathis (In re Mathis)*, 258 B.R.

726, 735 (Bankr. W.D. Ark. 2000)).  While the UST bears the burden of proof, once he "has

introduced evidence that the debtor committed any of the prohibited acts, the debtor has the

burden of coming forward with evidence to explain his conduct."  *Id*. (citing *Ramsay v. Jones (In*

*re Jones)*, 175 B.R. 994, 997 (Bankr. E.D. Ark. 1994)).

### (1)  Elements One, Two, and Five: Material false statements made under oath

For the first, second, and fifth elements under Section 727(a)(4)(A), the Court must

determine whether the Debtor made a statement under oath, and if so, whether that statement was

false and related materially to the Debtor's Chapter 7 Case.  The UST argues the Debtor's

statements regarding the transfer of the Residence in his SOFA and at the 341(a) meetings meet

these elements.  The Court agrees.

It is well-established that for purposes of Section 727(a)(4)(A), schedules and statements

signed under penalty of perjury and a debtor's testimony at the meeting of creditors constitute

oaths.  *In re Zulpo*, 592 B.R. at 251–52.  In the SOFA, signed under penalty of perjury, the

Debtor stated he "sold [his] house to parents during pendency of Chapter 11 case pursuant[t] to

court order." (UST Ex. 5, at 36).  At the 341(a) meetings the Debtor stated he reviewed and

signed his petition, schedules, and SOFA and that all statements therein were true and correct to

the best of his knowledge.  When asked if he transferred any property to anyone in the three

years before filing bankruptcy, the Debtor responded, "No" but answered, "Right" when the

Chapter 7 Trustee stated, "I'm going to represent to you that in your [SOFA] you stated that you

sold your homestead and three acres to your parents in 2015."  (Tr. at 67–68).  These statements

were false in that there was not a court order authorizing the sale of the Residence in the

Chapter 11 Case, and the Debtor did in fact transfer property in the three years prior to the Chapter 7 Case.

The false oaths were material because they related directly to the existence and disposition of the Debtor's property.  Statements are material if they bear "a relationship to the bankrupt's business transactions or estate, or concern[] the discovery of assets, business dealings, or the existence and disposition of his property."  *In re Sears*, 246 B.R. at 347 (quoting *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 618 (11th Cir. 1984) (per curiam)).  The UST argued that had the Chapter 7 Trustee taken the Debtor's statements and testimony as true, the Residence, valued at $250,000.00, could have been lost to the detriment of unsecured creditors. The Court finds the Debtor's misrepresentations in his SOFA and at the meetings of creditors constitute false oaths that related materially to his Chapter 7 Case.  The UST established elements one, two, and five under Section 727(a)(4)(A).

### (2)  Elements Three and Four: Made knowingly with fraudulent intent

Under the third and fourth elements, the UST must prove the Debtor knew the statements were false and made them with fraudulent intent.  *In re Cooper*, 399 B.R. at 646.  A statement is made "knowingly" if the Debtor "acted deliberately and consciously."  *In re Zulpo*, 592 B.R. at 253 (citing *Merena v. Merena (In re Merena)*, 413 B.R. 792, 815–16 (Bankr. D. Mont. 2009)). Fraudulent intent under Section 727(a)(4)(A) is broader than intent required under Section 727(a)(2) "because the objects of the fraud are not limited to creditors or officers of the estate." *Id*. (citing 6 COLLIER ON BANKRUPTCY ¶ 727.04[1][a] (Richard Levin & Henry J. Sommer eds., 16th ed.)).  A plaintiff may establish fraudulent intent under Section 727(a)(4)(A) by circumstantial evidence.  *Id.*  In addition, "statements made with reckless indifference to the truth

are regarded as intentionally false" under this provision.  *In re Korte*, 262 B.R. at 474 (quoting *Golden Star Tire, Inc. v. Smith (In re Smith)*, 161 B.R. 989, 992 (Bankr. E.D. Ark. 1993)).

The Court finds the UST failed to prove the Debtor knew his statements were false and failed to prove the Debtor made the statements with fraudulent intent.  As explained above in Part IV.B.(1)(b), the evidence supports a conclusion that the Debtor sincerely believed the Residence was sold to his parents (or AFF) as part of the 2015 closing, and he believed his bankruptcy counsel obtained the necessary approvals from this Court.  The evidence also supports a finding that the Debtor believed he accurately disclosed the transaction in his Chapter 7 Case.  He misunderstood the nature of the question regarding a "transfer" versus a "sale," but he answered the Chapter 7 Trustee's questions to the best of his abilities.  The falsity of the statements made in the SOFA and at the 341(a) meetings was not known to the Debtor.  The Court finds the Debtor did not deliberately or consciously make the false statements.  The UST failed to prove the Debtor "knowingly" made the false oaths.

Similarly, the UST failed to prove the Debtor acted with an intent to defraud.  The evidence in this case, including all circumstantial evidence, does not support a finding of fraudulent intent.  The Court has already found the UST failed to prove the Debtor acted with intent to hinder, delay, or defraud a creditor or officer of the estate under Section 727(a)(2).  Looking more broadly, as is required under Section 727(a)(4), the Court finds the UST failed to provide any evidence that the Debtor had any intent to defraud anyone by misrepresenting the information about the transfer of the Residence.

As stated in Part IV.B.(1)(b) above, the Court finds the Debtor's version of the sale of the Residence credible and supported by other evidence.  The evidence showed the Debtor took great efforts to obtain court approval for the transaction, speaking with his parents and even

34

taking his father with him to Ms. Robertson's office to discuss the proposed transaction. He believed the Residence was included in the 2015 closing and gave his best efforts to disclose this transaction in his current Chapter 7 Case. The evidence shows that while the disclosure was inaccurate, it was not made with reckless indifference to the truth. Rather, the evidence supports a finding of "an honest error or mere inaccuracy" which is "not a proper basis for denial of discharge." *In re Zulpo*, 592 B.R. at 253 ("A debtor will not be denied discharge if a false statement is due to mere mistake or inadvertence . . . [and] an honest error or mere inaccuracy is not a proper basis for denial of discharge." (quoting *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1294–95 (10th Cir. 1997))). Again, based on the evidence introduced at trial, the testimony given by the Debtor, and the Debtor's demeanor on the stand, the Court finds the Debtor to be an honest, hardworking individual who did not act with fraudulent intent.

Accordingly, the UST failed to prove the third and fourth elements under Section 727(a)(4)(A) and his cause of action under this provision must fail.

### V.  Conclusion

For the reasons stated herein, the Court finds the UST failed to establish that the Debtor's discharge should be denied. The UST's claims under Section 727(a)(2), (a)(3), (a)(4), and (a)(7) are DENIED. Judgment will be entered in favor of the Debtor, Anthony G. Arnold.

**IT IS SO ORDERED.**

Phyllis M. Jones
United States Bankruptcy Judge
Dated:  07/13/2023